J-A23025-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| STEVE CZAKO | : | |
| | : | |
| Appellant | : | No. 1589 WDA 2024 |

Appeal from the PCRA Order Entered December 9, 2024
In the Court of Common Pleas of Washington County Criminal Division at
No(s):  CP-63-CR-0002749-2016

BEFORE:  PANELLA, P.J.E., McLAUGHLIN, J., and BENDER, P.J.E.

MEMORANDUM BY McLAUGHLIN, J.:　　　　　**FILED:  February 2, 2026**

Steve Czako appeals from the order denying his Post Conviction Relief Act ("PCRA") petition. **See** 42 Pa.C.S.A. §§ 9541-9546. Czako argues his trial counsel was ineffective for failing to object to certain testimony and remarks made during the prosecutor's opening statement and closing argument. We affirm.

The charges against Czako stemmed "from the rape and sexual assault of his stepdaughter, K.P., and biological daughter, C.C., over the course of a number of years." [PCRA] Court Opinion and Order, filed December 9, 2024, at 1. The Commonwealth presented the testimony of both victims; R.P. (K.P.'s mother and C.C.'s step-mother); the victims' step-grandfather, T.T., who is married to Czako's mother; a CYS caseworker, Azure Hixenbaugh; and Officer Brian Butler of the Mount Pleasant Police Department. Czako testified in his own defense, and presented a character witness.

Following a two-day trial, a jury convicted Czako of one count each of aggravated indecent assault of a person less than 13 years of age and incest of a minor (complainant 13-18 years of age), and two counts each of rape by forcible compulsion, aggravated indecent assault of a person less than 16 years of age, indecent assault of a person less than 13 years of age, indecent assault by forcible compulsion, and indecent assault of a person less than 16 years of age.[1] The court sentenced him to an aggregate of 25 to 60 years' incarceration. We affirmed the judgment of sentence, and the Pennsylvania Supreme Court denied allowance of appeal. *See Commonwealth v. Czako*, 276 A.3d 264 (Pa.Super. 2022) (unpublished mem.), *appeal denied*, 288 A.3d 487 (Pa. 2022).

Czako, through counsel, filed a timely PCRA petition raising the instant claims that trial counsel was ineffective. Czako argued that his trial counsel was ineffective in failing to object to the prosecutor's opening statement and closing argument, alleging the prosecutor offered her personal opinions regarding Czako's guilt and the victims' credibility. Czako also argued his trial counsel was ineffective in failing to object to some of the testimony from Caseworker Hixenbaugh and Officer Butler, which Czako argued impermissibly bolstered the victims' credibility.

At a hearing, trial counsel testified that he did not believe any of the proposed objections were appropriate. The PCRA court denied relief. It noted

_____

[1] ***See*** 18 Pa.C.S.A. §§ 3125(a)(7), 4302(b)(2), 3121(a)(1), 3125(a)(8), 3126(a)(7), 3126(a)(2), and 3126(a)(8), respectively.

that at the start of trial, it had repeatedly instructed the jury that statements by and opinions of counsel do not constitute evidence, and that the jury was tasked with determining the credibility of each witness. Trial Ct. Op. and Order at 10-11 (citing N.T., Vol. I, at 9-10, 14). The court further noted that when charging the jury at the conclusion of trial, the court reiterated that the counsel's arguments are not evidence, and that the jury is the sole judge of the credibility of the witnesses and their testimony. *Id.* at 11-12 (citing N.T., Vol. II, at 136-41). The court concluded that because the jury is presumed to follow its instructions, trial counsel had no basis to object to the remarks and testimony going to the credibility of the witnesses. It further concluded that Czako had not suffered prejudice from trial counsel's failure to object because, given the jury instructions, "the credibility determinations of the jury were arrived at solely through the jury's own personal observations and recollection of the testimony." *Id.* at 13-14.

This appeal followed. Czako raises the following issues:

1. Whether the [PCRA] court erred in failing to find that trial counsel M. Jacob Mihalov, Esquire rendered ineffective assistance of counsel in failing to properly object to the Commonwealth's opening statement and closing argument at trial such that no reliable adjudication of guilt or innocence could have taken place.

2. Whether the [PCRA] court erred in failing to find that trial counsel M. Jacob Mihalov, Esquire rendered ineffective assistance of counsel in failing to properly object to the testimony of CYS Caseworker Azure Hixenbaugh and Officer Brian Butler at trial such that no reliable adjudication of guilt or innocence could have taken place.

Czako's Br. at 8.

"Our standard of review from the denial of post-conviction relief is limited to examining whether the PCRA court's determination is supported by the evidence of record and whether it is free of legal error." ***Commonwealth v. Ligon***, 206 A.3d 515, 518 (Pa.Super. 2019) (internal quotation marks and citation omitted).

Both of Czako's issues advance claims of trial counsel ineffectiveness. We presume counsel was effective. ***Id.*** at 519. To prevail on claims of ineffectiveness, a PCRA petitioner must prove each of the following: "(1) the underlying legal claim is of arguable merit; (2) counsel's action or inaction lacked any objectively reasonable basis designed to effectuate his client's interest; and (3) prejudice, to the effect that there was a reasonable probability of a different outcome if not for counsel's error." ***Id.*** (citation omitted).

In his first issue, Czako argues that his trial counsel was ineffective for failing to object during the prosecutor's opening and closing.

"[G]iven the critical role that the Commonwealth plays in the administration of justice, a prosecutor has been historically prohibited from expressing a personal belief regarding a defendant's guilt or innocence or the veracity of the defendant or the credibility of his witnesses." ***Id.*** at 519–20 (internal quotation marks and citation omitted). In arguing before the jury, a prosecutor is limited to summarizing the evidence, offering fair deductions and inferences from the evidence, asserting that the evidence establishes the defendant's guilt, and responding to defense arguments. ***Id.*** at 519; ***see also***

*Commonwealth v. Anderson*, 327 A.3d 273, 282 (Pa.Super. 2024). A prosecutor may also respond to defense challenges to the credibility of the Commonwealth witnesses. *Anderson*, 327 A.3d at 284. In addition, a prosecutor "enjoys substantial latitude to present argument with logical force and vigor" and is permitted some "oratorical flair." *Id.* at 282 (internal quotation marks and citations omitted).

To determine whether a prosecutor's remarks amount to reversible error, we engage in a two-part analysis: "1) does the substance of the remarks relate to the facts of the case, the elements of the crimes charged, and constitute a fair and reasonable rebuttal to the defenses' arguments and 2) do the remarks have a prejudicial effect on the jury." *Ligon*, 206 A.3d at 520. "[T]o evaluate whether the comments were improper, we do not look at the comments in a vacuum; rather we must look at them in the context in which they were made." *Anderson*, 327 A.3d at 283 (citation omitted). Prejudice only occurs where the remarks have the unavoidable effect of "forming in [the jurors'] minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict." *Ligon*, 206 A.3d at 520 (citation omitted); *see also Anderson*, 327 A.3d at 282 ("Reversible error occurs only if the prosecutor has deliberately attempted to destroy the factfinder's objectivity").

Czako alleges counsel should have objected to the following portion of the prosecutor's opening statement:

Now, as you listen to the witnesses here on the stand today, you got to keep in mind that crimes of sexual abuse are very, very different by their very nature than other types of crimes such as robberies or burglaries or bar fights.

Sex crimes occur in private, behind closed doors where these is no one there but the perpetrator and his victim. So as a result, it is very unlikely that you are ever going to have eyewitnesses such as in crimes of bar fights or robberies or things like that.

And also, for a variety of reasons, such as because of the shame, because of the embarrassment, or in a case like this where the victims are children dependent upon the perpetrator for their very support — for the roof over their head, the food they eat, the love they receive — victims of sexual abuse don't always come forward right away. It takes awhile [sic]. That reporting is delayed sometimes for years. And because of that delay, when it finally comes to light, any physical evidence, which you may hear of on all of these TV shows, like CSI — physical evidence, DNA, or hair, or semen, or saliva by the time these reports come forward, that is long gone. Washed away. Disappeared. Unable to be recovered. And any physical evidence, such as injuries that you might think might occur, even if they did occur, by the time these crimes are reported, they too have healed. They too have gone. So the only evidence that you will have today is the evidence from the witnesses, the testimonial evidence from that stand and you must know that testimonial evidence from witnesses is evidence. The Judge told you that in her initial instructions to you this morning.

And the legislators of this state, of the Commonwealth they know the problems and issues and differences of sexual abuse. And because they knew and understood that, they drafted laws to account for those differences. You will receive instructions from the Court today or throughout the trial that in these types of cases, sexual abuse cases, the testimony of the victims standing alone without any other corroborative evidence, if believed by you, is enough with which to convict the defendant of the crimes with which he is charged.

N.T., 3/14/2018 ("Vol. I"), at 25-27.

Czako argues these remarks "suggest that the burden of proof and amount of proof required in sexual assault cases is different and less than

those involved in other types of cases." Czako's Br. at 18. Czako further argues the prosecutor "suggested that sexual assault victims behave in ways different than those for other offenses," and that these comments "amounted to the assertion of expert, specialized evidence and testimony," for which no witness was presented. *Id.*

The PCRA court's rejection of this claim is supported by the record and free of legal error. The prosecutor did not comment on the burden of proof. Rather, the comments related to the types of evidence that would be presented to the jury. The prosecutor attempted to prepare the jury to hear testimony about sex crimes that occurred in private and were not reported for a long time and thus, as a matter of course, could only be proven by the victim's testimony. This argument was grounded in Pennsylvania law, which provides that the uncorroborated testimony of the victim of a sexual offense is sufficient to establish the offense. *See* 18 Pa.C.S.A. § 3106. Czako has not shown that the comments would have inflamed the jury's emotions. Czako's trial counsel would have had no reasonable basis to object to these statements. Moreover, Czako has failed to establish prejudice – that but for the comments, there is a reasonable probability the outcome of the trial would have been different. The PCRA court properly rejected this claim.

Czako next contends his trial counsel was ineffective for failing to object to five portions of the prosecutor's closing argument. First, Czako claims counsel should have objected to the following:

In fact, you will hear how [K.P.] described to you — remember when she said she reached the age of 11 or 12 and [Czako] started putting his penis in her vagina? Think of the detail she went into, how he started ever so slightly, just the tip of it into her vagina. Extremely painful for a child of 10, 11. However old she may be. Extremely painful. And when it got too painful that she couldn't take it anymore, he would back off, and the next time just a little further, and the next time, just a little further after that, until finally he had conditioned that child's body to accommodate his adult male penis.

And when you hear those kind of details. You should know, as jurors, that this is true. Because if it was made up, she would tell you the story that he violently thrust his penis into her, and if that was the case, the pain would have been more than that child would bear, and perhaps there would have been injury. And perhaps there would have been yelling and screaming if that had happened.

N.T., 3/15/2018 ("Vol. II"), at 85. Czako argues these comments were "impermissible opinion testimony" regarding the defendant's guilt and the victim's credibility. Czako's Br. at 20-21.

The PCRA court properly rejected this claim. The prosecutor did not give her own opinion of Czako's guilt or the victim's credibility. Rather, the prosecutor suggested the jury find K.P. credible based on her testimony and the facts of the case, and in response to the defense's challenge to K.P.'s credibility. This was permissible argument, and trial counsel had no reasonable basis on which to object.

The second portion of the prosecutor's closing that Czako challenges is:

First, [C.C.] gets carted off to Washington Hospital. She told you she's put into a room with a trained forensic interviewer, who is asking her these intimate questions, someone she's never seen before. . . . And then once she's done with that forensic interview, she gets to come here to the courthouse, and she goes and she speaks not only with Officer Butler but Detective Bev Ashton, two

victim advocates, an assistant district attorney in the room. And she has to go over and over these details again with those people . . . .

And then, after that, she told you she has to go to a preliminary hearing, and she has to take the stand before Magisterial District Judge, and she has to face that man, that man that sexually abused her, and again in a courtroom, in front of spectators, and a police officer, and another judge, and explain again over and over those sexual acts and abuse that happened to her. . . .

. . . [C.C.]'s just a child, 16 years old. She's only a junior in high school. Could anyone of you have done that, taken the stand in front of all these strangers and discussed your intimate, sexual details as to what part goes where, how it gets there, and everything else?

And you know what? Neither of these victims is sophisticated enough to carry on a lie of this magnitude. [K.P.] herself — there was no corroboration or communication between the two girls. [K.P.] had left the house when this came out. She held this secret for years. She was gone already. Moved out. No communication between them. They never discussed it. It was only when [C.C.] came forward and [K.P.] found out from [Trulli] telling her boyfriend who told her that she, herself, went directly to CYS. Not to [C.C.]. Not to anyone else. Went to CYS and told there, a stranger at CYS, what had happened to her. And then she too had to go through that same process. After she tells CYS, then she has to come to the district attorney's office, and meet with the officer, the detective. Then she had to go to the preliminary hearing, and she had to come here before you again and go through all of that. [C.C.,] 16, a junior still in high school. [K.P.], very young, 23, just a high school graduate.

Do you honestly think that they are sophisticated enough to go through trained investigators, a trained investigator at the Washington County Child Advocacy Center, a trained police officer, a trained detective, a trained assistant district attorney, a judge in another courtroom, and all of you here? Do you honestly think that they are sophisticated enough to carry a lie of this magnitude over and over and over so consistently and believably? And they are not. The reason they can do that is because it is not a lie. It is true.

N.T., Vol. II, at 97-100. Czako again contends the prosecutor "sought to bolster the testimony of the alleged victims by arguing that trained personnel and judges in other courtrooms had already considered the testimony of the alleged victims to be credible." Czako's Br. at 22.

This issue is meritless. The prosecutor was permitted to summarize the testimony. Moreover, the prosecutor was properly responding to the defense theory that the victims were not credible by suggesting that the jury draw the opposite inference based on the testimony. Trial counsel was not ineffective for failing to object.

The third portion of the closing argument that Czako challenges is:

> What does [Czako] have to gain by sitting up there and lying? He has to gain a lot. Because by sitting up there and being dishonest and by perjuring himself, he hopes to convince you so that he can escape a very serious conviction.

N.T., Vol. II, at 100-01. Czako contends that "the prosecutor not only [gave] her personal opinion of [Czako]'s credibility, but also accuse[d] him of the crime of perjury which has not been charged and for which he is not on trial." Czako's Br. at 23.

We find no merit to this claim, either. The prosecutor was responding to the defense argument that the jury should find Czako's testimony credible. *See* N.T., Vol. II, at 75 (Trial counsel arguing, "I think [Czako]'s honest to a fault"). The prosecutor merely urged the jury to make the commonsense inference that Czako's testimony was self-serving. The prosecutor did not

imply that Czako was formally charged with the crime of perjury. The remark, in context, was not so improper as to render the jury biased against Czako.

Fourth, Czako challenges the prosecutor's statement that Czako's testimony "is just full of contradictions, back and forth, because it is not true. It is a lie." N.T., Vol. II, at 102-03.

Again, the prosecutor was permissibly responding to the defense assertion that Czako's testimony was true. *See* N.T., Vol. II, at 75.

Finally, Czako argues trial counsel was ineffective for failing to object to the following statement:

> And then, after that, you heard [K.P.] say how this sexual abuse produced feelings in her where she actually enjoyed it. Now, if that wasn't true, no one is going to get on the stand and tell you that. That is so raw and so honest, you have to know it's true. And I'm sure that was shocking to some of you, and I am sure that was disturbing to hear that. But think about it. It's biology. It's not emotion. Our bodies are designed by nature to reproduce. In order for our bodies to reproduce, nature has to make it pleasurable. Nature puts nerve ending in certain locations so that sex is pleasurable strictly for the purpose of procreation.
>
> And that defendant, you heard, he started from the time she was 8, just touching, then fingers, then penile penetration. He conditioned that girl's body to respond to sexual stimulus. That is total biology that her body was conditioned, and she was trained emotionally and psychologically to accept that, and as a 16-year-old [to] enjoy it.
>
> But she told you on the stand, she sure didn't enjoy it in the beginning because she was a little child, and that was before he could condition and train her. She told you how it was painful, how he had to push it in and pull it out, and how she would tell him to stop. And the emotions that she exhibited there — she told you something so honest and so personal, you have to know it's real.
>
> And she also told you she was disgusted. And it's so sad. She's disgusted not just with the defendant, but she said she was

disgusted with herself. And that's sad because this wasn't her fault. This wasn't her fault at all. It was the fault of the man [who] purported to be her father.

N.T., Vol. II, at 104-06. Czako claims that in this passage, the prosecutor offered her own analysis of the alleged victims' behaviors without an evidentiary basis, and improperly bolstered their credibility. Czako's Br. at 24.

This claim lacks merit. The prosecutor reiterated the testimony and urged inferences the jury should draw from that testimony. She did not exceed the latitude provided for argument, and thus, defense counsel had no basis to object. Furthermore, Czako has again failed to meet the prejudice prong.[2]

In his second issue, Czako argues his trial counsel was ineffective for failing to object to portions of the testimony given by CYS Caseworker Hixenbaugh and Officer Butler. Czako first claims trial counsel was ineffective for failing to object to the following testimony of Caseworker Hixenbaugh:

[Prosecutor]: . . . After that, did CYS have occasion to become involved again?

[Caseworker Hixenbaugh]: Yes. In 2016.

_____

[2] Overall, Czako contends that his counsel had no reasonable basis for failing to object, and counsel's failure to object caused him prejudice because "the Commonwealth's case relied heavily and almost exclusively upon the credibility of the two (2) alleged minor victims," as trial counsel admitted at the PCRA hearing. Czako's Br. at 14. He asserts that although the court instructed the jury that opening statement and closing argument should not be considered evidence, "the pervasive nature of the Commonwealth's improper bolstering was so egregious that the presumption that the jury would follow the trial court's instructions has been overcome in this case." *Id.* at 25. As above, we do not think the comments amounted to improper bolstering. Moreover, the disputed comments were not of such a nature as to establish that but for the comments, the jury would have reached a different result.

- 12 -

[Prosecutor]: And how did that come about?

[Caseworker Hixenbaugh]: There w[ere] concerns regarding allegations with [C.C.], which were eventually indicated. [C.C.] made clear and consistent statements of abuse and then [K.P.] also. That was not through the agency. That was through law enforcement.

N.T., Vol. I, at 180.

Czako claims that by testifying the victims' allegations were "indicated," Caseworker Hixenbaugh improperly testified that a determination had been made regarding the allegations under 23 Pa.C.S.A. § 6303.[3] *Id.* at 29-30. Czako argues, "even if the jury was not made aware of the specific statutory meaning of the term, the context of the testimony clearly indicated to the jury that CYS believed the allegations to be true," which constituted an inadmissible opinion regarding the victims' credibility. *Id.* at 30; *see also id.* at 29 (citing *Commonwealth v. Loner*, 609 A.2d 1376 (Pa.Super. 1992) (*en banc*)).

"Under longstanding Pennsylvania precedent pertaining to jury trials, . . . determining witness credibility is exclusively the function of jurors[.]" *Commonwealth v. Maconeghy*, 171 A.3d 707, 712 (Pa. 2017). Therefore, "an expert witness may not express an opinion that a particular complainant was a victim of sexual assault based upon witness accounts . . . at least in the absence of physical evidence of abuse[, because s]uch testimony intrudes into

---

[3] An "indicated report" is one for which the Department of Human Services or a county children and youth social service agency has determined, after investigation, "that substantial evidence of the alleged abuse . . . exists[.]" 23 Pa.C.S.A. § 6303.

the province of the jury relative to determining credibility." ***Id.***; ***see also***

***Commonwealth v. Jones***, 240 A.3d 881, 896 (Pa. 2020) (stating that expert

testimony regarding a witness's credibility "is impermissible, as it encroaches

on the province of the jury to make such determinations"). While an expert in

a sex offense case may "testify to facts and opinions regarding specific types

of victim responses and victim behaviors," an expert's "opinion regarding the

credibility of any other witness, including the victim," is not admissible. 42

Pa.C.S.A. § 5920(b)(2), (b)(3).

Here, Caseworker Hixenbaugh made a passing reference that CYS's

"concerns" regarding C.C.'s allegations had been "indicated." She did not say

that "indicated" involved any determination as to truth, or state that she or

anyone else believed the victims' allegations.[4] Rather, her overall testimony

was that C.C. made clear and consistent statements in alleging the abuse, and

that K.P., who was no longer a minor, made clear and consistent allegations

of abuse to law enforcement. This testimony was admissible. ***See*** Pa.R.E.

613(c) (providing a witness's prior consistent statement is admissible to

rehabilitate the witness's credibility).

---

[4] ***Cf. Loner***, 609 A.2d at 1377 (finding caseworker's testimony that she had "believed the victim's statements and accordingly had placed her in foster care" was inadmissible); ***Commonwealth v. Kane***, No. 2509 EDA 2018, 2020 WL 2781553, at *7 (Pa.Super. filed May 28, 2020) (unpublished mem.) (finding caseworker's testimony that a report of abuse was "indicated" and explaining that "indicated" meant there was enough evidence to support a finding that the allegations were true, was inadmissible).

To the extent Caseworker Hixenbaugh's could be construed as a comment on the victims' credibility, Czako has failed to demonstrate that counsel's failure to object to the passing comment caused him prejudice. She was not held out as an expert, and there was no testimony indicating Caseworker Hixenbaugh had training or experience in determining the veracity of child witnesses such that the jury would have placed undue weight on her opinion. *See Commonwealth v. Hernandez*, 615 A.2d 1337, 1341 (Pa.Super. 1992) (finding counsel was not ineffective for failing to object to caseworker's testimony that report was "indicated" where caseworker "was not qualified as, nor had she presented herself as, any type of expert in child sexual abuse"); *cf. Loner*, 609 A.2d at 1377 n.2 (finding caseworker's testimony inadmissible where she "testified that she had undergone specialized training in the area of interviewing and working with child-victims of abuse").

Furthermore, this is not a case where the Commonwealth's evidence hinged on a single victim's testimony. *Cf. Commonwealth v. Balodis*, 747 A.2d 341, 347-48 (Pa. 2000) (finding counsel ineffective for failing to object to opinion testimony on the credibility of single child sex victim); *Commonwealth v. Davis*, 541 A.2d 315, 316 (Pa. 1988) (finding counsel ineffective for failing to object to expert testimony where only evidence of abuse was single victim's testimony).[5] Here, not one, but two victims testified

---

[5] *See also Jones*, 240 A.3d at 884 (single victim); *Maconeghy*, 171 A.3d at 708 (same).

that Czako abused them. Czako has not established that exclusion of the challenged testimony would have changed the outcome of the trial.

Czako's final contention is that trial counsel was ineffective for failing to object to the following testimony of Officer Butler, during direct examination:

> Q: Can you please tell us how [it] came about that you filed these charges?
>
> A: Well, in cases such as this, there is a standard format, a standard protocol that takes place. Typically, the first thing that happens is we get a form known as a 104 from CYS, and CYS will indicate to us that abuse is being carried out upon a potential victim. And then from there, we contact CYS, and then we set up what is called a forensic interview. And then once we set up the forensic interview, that is when we meet with the alleged victims and personnel from CYS. And then we move forward depending on what we hear from the — from the interview. And if we deem the charges are necessary, we move forward.
>
> Q: Okay. So was that done in this case? Did you receive a 104, the form that you described?
>
> A: Yes. Yes. That's exactly what happened in this case.
>
> Q: Okay. Do you know approximately when you received that 104?
>
> A: Yes. It would have been May 6th. Yeah. It was May 6th of 2016.
>
> Q: Okay. And once you received that 104, describe the investigation that you conducted into this case?
>
> A: Well, again. Following standard protocol, the 104 is typically just give[s] us a brief overlay — a brief overview I should say of what is occurring. And then as I mentioned before, the next step is to follow up with the CYS caseworker, which is what I did. And then from that point on, we then coordinate a time, and we meet at the advocacy center at Washington Hospital. And then we have an interview that takes place; a forensic interview that is done with a professional.
>
> Q: Okay.

A: And then from there, we hear what the alleged victim has to say, which is what I did.

Q: Which victim is that?

A: And that would be [C.C.].

Q: And then after the forensic interview with [C.C.], what did you do next?

A: At that point, we determined that what the allegations that were being told were taking place were pretty substantial and most likely true. And then so — at that point, I followed up and I conducted my incident report and then contacted the DA's office. And then we had a special victim's interview that was scheduled at the courthouse with members of the special victims unit and specialists in sex crimes, and then we had an interview with [C.C.] as well.

And it should also be noted that during the time we had — in between the time of the special victim's interview and the forensic interview with [C.C.], it came forward that [K.P.] was also a victim as well. So for the special victim's interview we also had [K.P.] there present with [C.C.].

Q: Okay.

A: And we heard what they had to say.

Q: Once those interviews were conducted, did you do any further investigation?

A: Yes. I did reach out. Actually, I should say that he reached out to me. That would be Ted Trulli, who we heard from earlier. And he gave me some further insight on his accounts of what he had heard, specifically from [C.C.], and the interactions that he had with the defendant.

Q: Okay. And were there any other interviews with anyone else in the matter? Did you speak to Ms. [P.] at all?

A: Yes. Yes. I did speak with Ms. P[.]. I spoke with [her] directly after the forensic interview with [C.C.]. And I explained to her some of the things that we heard. Well, I explained to her a lot of what we heard [C.C.] say. And I explained to her the nature of the alleged offenses and —

Q: And just to clarify, by Ms. P[.], we mean?

A: Yeah. I apologize. Yeah. I mean [R.P.], the mother. Yes.

Q: Okay. After that, was there anything further that you did prior to filing the charges? Did you speak to Children and Youth Services at all?

A: Well, yeah. We spoke with — I was in pretty consistent contact with Children and Youth and people from the district attorney's office, Bev Ashton. I also reached out to Mark Schmelzlen, and I did make contact with some people from CYS just to confirm.

Q: Okay. Now, after you did these interviews, did you have an opportunity, or did you conduct — or have the victims submit to any sort of rape kit testing?

A: No. No. We did not.

Q: Can you tell us why you did not?

A: Well, because there was a — the time frame in which the last incident would have occurred was several months had gone by. I believe the last report of any incident occurring was somewhere towards the end of 2015, I believe. Towards the end of 2015, beginning of 2016. And then, obviously, these allegations didn't come to us until May. So any physical evidence, any DNA evidence, any type of seminal fluid, blood, anything like that — all of that would have not been present. And being that a rape kit is a very invasive and uncomfortable procedure, it would be really unnecessary to put the girls through that considering, you know, negative results.

N.T., Vol. I, 182-87.

Czako argues that the prosecutor was attempting to use Officer Butler "to improperly bolster the testimony of the alleged victims by suggesting to the jury that since the alleged victims told their stories multiple times, to multiple people in authority (many of whom were portrayed as 'experts') and the case moved forward to trial," that those people had believed the victims were telling the truth. Czako's Br. at 34. He also asserts that Officer Butler's testimony "concerning the technical aspects of what would have been or would

not have been found in a rape kit and the effect of the passage of time" was impermissible expert testimony. *Id.*

Beginning with the latter assertion, we find no merit to the claim that counsel was ineffective for failing to object to Officer Butler's testimony that medical "rape kit" tests are ineffective at obtaining physical evidence months after a sexual offense occurs. Even if Officer Butler's testimony regarding the unavailability of rape kit testing may be considered specialized knowledge, such that trial counsel should have objected on the basis that Officer Butler had not been offered as an expert, this testimony did not suggest the victims were credible. *Cf. Jones*, 240 A.3d at 892 (finding police officer's testimony that child abuse victims frequently forget dates and details of sexual assaults impermissibly constituted specialized knowledge that allowed jury "to draw an inference that the victim's behavior in this case was consistent with similarly situated victims"). Czako has failed to explain how an objection to the rape kit testimony would have changed the outcome of the proceedings.

Nor does the first claim warrant relief. Czako has not shown that but for counsel's failure to object, there is a reasonable probability that the outcome of the trial would have been different. Officer Butler made these statements as part of his explanation of the history of the investigation. *See Hernandez*, 615 A.2d at 1341 (finding counsel was not ineffective for failing to object to caseworker's testimony that "was nothing more than the chronology of events which ultimately led to the charges being initiated against" the defendant). Furthermore, he testified as a layperson. The jury was not told that he was an

expert, and he and did not testify about any related training or experience. *Cf. Jones*, 240 A.3d at 892 (finding police detective's testimony regarding common victim behavior in response to sexual abuse was not harmless where the Commonwealth emphasized the officer's training and experience). Nor did Officer Butler testify as to the expertise of any other alleged "experts" involved, or specifically testify that they believed the victims.

In addition, as stated above, two victims testified against Czako, not one. Even if Officer Butler had testified as an expert, any potential bolstering of the victim's credibility by Officer Butler's opinion would have had a less prejudicial effect than where the Commonwealth's case was made out by the testimony of a single victim. *Cf. Balodis*, 747 A.2d at 347-48; *Davis*, 541 A.2d at 316. Czako has failed to prove prejudice.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 2/2/2026